**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICAN FOREST RESOURCE COUNCIL**, *et al.*, | Civil Case No. 1:21-cv-00601-RJL |
| *Plaintiffs*, | |
| v. | |
| **MARTHA WILLIAMS**, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 5

    A.   Plaintiffs ................................................................................................... 5

    B.   Legal Background ..................................................................................... 8

        1.   Endangered Species Act .............................................................. 8
        2.   The O&C Lands Act ..................................................................... 9

    C.   Factual and Procedural Background ........................................................ 11

        1.   Listing Decision and 1992 Critical Habitat Rule ....................... 11
        2.   Management of Federal Lands by the Forest Service and BLM ............. 11
        3.   2008 and 2012 Critical Habitat Rules ........................................ 13
        4.   2021 Critical Habitat Rule .......................................................... 13
        5.   Defendants issue the Delay Rule without notice and comment, effective immediately............................................................... 16

III.  STANDARD OF REVIEW ................................................................................ 16

IV.   ARGUMENT ..................................................................................................... 18

    A.   The delay rule violates the APA's procedural requirements. ................. 18

        1.   The Service cannot show good cause because the alleged need to bypass rulemaking requirements was a product of the Service's own making............................................................................ 20
        2.   The Service cannot show good cause because the Delay Rule is based on the irrational premise that an immediate delay is needed for the Service to determine whether the delay is merited. ................. 22
        3.   Alleged concern about a "potential" "notice-and-comment defect" of the 2021 Rule is not good cause to bypass notice and comment requirements............................................................................ 23
        4.   The "history of litigation and newly threatened suits" are not good causes. .................................................................................... 27
        5.   The ESA's "conservation purpose" and unexplained concern about "preventing the Service from performing its functions" do not establish good cause.................................................................. 29
        6.   The Service also failed to establish good cause for waiving the APA's 30-day wait requirement. .......................................................... 32

    B.   The Delay Rule violates the APA's substantive requirements. .............. 33

    C.   The Delay Rule violates the O&C Act's sustained yield mandate. ......... 34

    D.   The Delay Rule must be vacated and the 2021 Rule's effective date reinstated. .............................................................................................. 36

V.    CONCLUSION .................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFRC v. Hammond*,
   422 F. Supp. 3d 184 (D.D.C. 2019)................................................................12, 35

*AFRC v. Steed*,
   No. 16-1599-RJL, 2019 WL 1440887 (D.D.C. Nov. 22, 2019)...........................15

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014).........................................................................36

*Am. Fed'n of Govt. Employees v. Block*,
   655 F.2d 1153 (D.C. Cir. 1981).........................................................................32

*Appalachian Power Co. v. EPA*,
   135 F.3d 791 (D.C. Cir. 1998).......................................................................26, 27

*Carpenters Indus. Council v. Salazar*,
   734 F. Supp. 2d 126 (D.D.C. 2010)...................................................................13

*Carpenters Indus. Council v. Zinke*,
   854 F.3d 1 (D.C. Cir. 2017).....................................................................1, 6, 7, 19

*Chamber of Com. of U.S. v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006).......................................................................19, 31

*City of Portland v. EPA*,
   507 F.3d 706 (D.C. Cir. 2007).........................................................................25

*Connecticut v. U.S. Dep't of Interior*,
   344 F. Supp. 3d 279 (D.D.C. 2018)...................................................................16

*Consumer Energy Council of Am. v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982).......................................................................20, 23

*Council of the Southern Mountains v. Donovan*,
   653 F.2d 573 (D.C. Cir. 1981) (per curiam)...................................................18, 20

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009).....................................................................24, 25

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019).................................................................................22, 23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................................................................... 4

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ................................................................................................. 17

*Env't Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ..................................................................................... 24

*Envtl. Def. Fund, Inc. v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ........................................................................ 4, 17, 19

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995), *opinion amended* 967 F. Supp. 6 (D.D.C.
1997) ............................................................................................................................. 16

*Idaho Conservation League v. Wheeler*,
930 F.3d 494 (D.C. Cir. 2019) ..................................................................................... 24

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ................................................................................... 24

*In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*,
853 F. Supp. 2d 138 (D.D.C. 2012) ............................................................................. 36

*Mack Trucks, Inc. v. EPA.*,
682 F.3d 87 (D.C. Cir. 2012) ............................................................................... 4, 19

*Mobil Oil Corp. v. Dep't of Energy*,
610 F.2d 796 (Temp. Emer. Ct. App. 1979) ............................................. 21, 22, 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................... 17, 34

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ......................................................................... 4, 19, 21, 22

*Nat. Res. Def. Council v. EPA*,
683 F.2d 752 (3d Cir. 1982) ........................................................................ 18, 21, 36

*Nat'l Venture Cap. Ass'n v. Duke*,
291 F. Supp. 3d 5 (D.D.C. 2017) ................................................................................. 36

*National Association of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ...................................................................................................... 35

*O.A. v. Trump*,
404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................. 36

*Oregon & Cal. R.R. Co. v. United States*,
238 U.S. 393 (1915)...................................................................................................9

*Organized Village of Kake v. U.S. Department of Agriculture*,
795 F.3d 956 (9th Cir. 2015) (en banc) .............................................27, 28, 33

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007)..................................................................27

*Pac. Nw. Reg'l Council of Carpenters v. Bernhardt*,
No. 13-cv-361-RJL (D.D.C.) ...................................................................2

*Sharon Steel Corp. v. EPA*,
597 F.2d 377 (3d Cir. 1979).....................................................................21

*Sorenson Commc'ns Inc. v. F.C.C.*,
755 F.3d 702 (D.C. Cir. 2014).........................................4, 17, 24, 28

*Swanson Grp. Mfg. LLC v. Bernhardt*,
417 F. Supp. 3d 22 (D.D.C. 2019) ..........................................................34

*Tenn. Gas Pipeline Co. v. FERC*,
969 F.2d 1141 (D.C. Cir. 1992)........................................17, 23, 29, 30

*United States v. Cain*,
583 F.3d 408 (6th Cir. 2009) .............................................................24, 32

*United States v. Valverde*,
628 F.3d 1159 (9th Cir. 2010) ................................................................29

*W. Council of Indus. Workers v. Sec'y of Interior*,
Civ. No. 02-6100-AA (D. Or.)..................................................................13

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*,
139 S. Ct. 361 (2018)......................................................2, 9, 30, 31

**Statutes**

5 U.S.C. §§ 551(5), 553 ...............................................................................19, 20

5 U.S.C. § 706(2)(A)..........................................................................................17

16 U.S.C. §§ 1531 *et seq*..................................................................... *passim*

43 U.S.C. § 1712..................................................................................................12

43 U.S.C. §§ 2601 *et seq*................................................................... *passim*

**Rules**

50 C.F.R. § 402.01(b) ........................................................................................8

55 Fed. Reg. 26,114 (June 26, 1990) ........................................................11

57 Fed. Reg. 1,796 (Jan. 15, 1992) ...............................................3, 11, 14

73 Fed. Reg. 47,326 (Aug. 13, 2008) ..........................................3, 13, 15

77 Fed. Reg. 71,876 (Dec. 4, 2012) ......................................... *passim*

85 Fed. Reg. 48,487-01 (Aug. 11, 2020) ....................................13, 25, 27

86 Fed. Reg. 11,892 (Mar. 1, 2021) ........................................ *passim*

Plaintiffs American Forest Resource Council ("AFRC"), the Association of O&C Counties ("AOCC"), Douglas County, Lewis County, Siskiyou County, and Skamania County (collectively, "Plaintiffs") file this memorandum in support of their motion for summary judgment.

## I.    INTRODUCTION

This case is about an agency denying the public required process in making an extralegal, arbitrary decision to continue an unlawful policy that severely harms rural communities in the Pacific Northwest, despite revisions to that policy undertaken in furtherance of the controlling statute and direction from the Supreme Court. This case follows a long line of challenges to a series of controversial U.S. Fish and Wildlife Service ("Service") rules designating critical habitat for the Northern Spotted Owl ("NSO") pursuant to the Endangered Species Act ("ESA"). Here, Plaintiffs challenge the Service's Revised Designation of Critical Habitat for the Northern Spotted Owl; Delay of Effective Date, 86 Fed. Reg. 11,892 (Mar. 1, 2021) ("Delay Rule"), which amended the effective date of the Revised Designation of Critical Habitat for the Northern Spotted Owl (*Strix Occidentalis caurina*), 86 Fed. Reg. 4,820 (Jan. 15, 2021) ("2021 Rule").

The 2021 Rule revised the Service's 2012 Critical Habitat Rule, which sweepingly and unlawfully designated *9,577,969 acres* in Washington, Oregon, and California as critical habitat for NSO, causing severe socioeconomic damage to communities that depend on sustainable timber harvests from the designated lands. *See* Designation of Revised Critical Habitat for the NSO, 77 Fed. Reg. 71,876 (Dec. 4, 2012) ("2012 Rule"). As the D.C. Circuit explained, "[t]o put the agency's action in perspective, the designated critical habitat area [under the 2012 Rule] is roughly twice the size of the State of New Jersey. . . . The critical habitat designation means that a huge swath of forest lands in the Pacific Northwest will be substantially off-limits for timber harvesting." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 2 (D.C. Cir. 2017) (Kavanaugh, J.).

1

The Service issued the 2021 Rule following a settlement of a long-running challenge to the 2012 Rule brought by a coalition of counties, trade associations, and timber companies, including several of the Plaintiffs here. *See Pac. Nw. Reg'l Council of Carpenters v. Bernhardt*, No. 13-cv-361-RJL (D.D.C.). In that case, plaintiffs asserted, among other claims, that the Service (1) violated the ESA by designating over a million acres as "critical" habitat that are not NSO habitat; (2) violated the ESA by failing to consider relevant economic impacts in conducting an exclusion analysis pursuant to section 4(b)(2); (3) violated the ESA by failing to exclude areas where the benefits of designation were exceeded by the benefits of exclusion; and (4) violated the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act") by designating as critical habitat, lands committed by Congress to permanent forest production on a sustained-yield basis.

The Service agreed to settle the challenge to the 2012 Rule following the Supreme Court's decision in *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361 (2018), which bolstered plaintiffs' ESA claims. In *Weyerhaeuser*, the Supreme Court unanimously held unlawful the Service's practice of designating land that is not currently habitat for a species as critical habitat for that species, and ruled that ESA Section 4(b)(2) "imposes a categorical requirement that the Secretary [of the Interior] tak[e] into consideration economic and other impacts before" designating critical habitat. *Id.* at 371 (quotations omitted). This Court approved the settlement, which required the Service to conduct a rulemaking process to consider excluding areas from the critical habitat designation. *Pac. Nw. Reg'l Council*, No. 13-cv-361-RJL, Dkt. 127 (Apr. 26, 2020).

Following a notice-and-comment rulemaking process involving extensive stakeholder participation, the Service finalized the 2021 Rule, which specified "approximately 6,105,279 acres of designated critical habitat as well as several million additional acres of protected habitat for the

northern spotted owl in designated wilderness and National Parks, throughout the owl's range." 86 Fed. Reg. at 4,840. The size of the revised designation is comparable to the 6,887,000 acres of NSO critical habitat originally designated by the Service in 1992, 57 Fed. Reg. 1,796, 1,800-11 (Jan. 15, 1992) ("1992 Rule"), and more than the 5,312,300 acres of habitat designated by the Service in 2008, 73 Fed. Reg. 47,326 (Aug. 13, 2008) ("2008 Rule"). In fact, the 2021 Rule designates more critical habitat within National Forests than either the 1992 or 2008 rules. As the 2021 Rule notes, there are also several million acres within National Parks or wilderness in the owl's range, 86 Fed. Reg. at 4,840, plus about 1.4 million state or private acres covered by conservation plans.  2012 Rule, 77 Fed. Reg. at 71,948-49.

The 2021 Rule excluded approximately 3,472,064 acres in California, Oregon, and Washington from the critical habitat designation under the 2012 Rule. The exclusions were based on the Secretary of the Interior's determination, pursuant to section 4(b)(2) of the ESA, that the benefits of excluding these areas outweigh the benefits of designating these areas as critical habitat in light of economic and other relevant impacts, and that the exclusions will not result in the NSO's extinction. The exclusions were also based on the requirements applicable to certain timberlands under the O&C Act. As the Service explained in the 2021 Rule, "[t]he O&C Act provides, and the courts have confirmed, that the primary use of these revested timberlands is for permanent forest production on a sustained yield basis," and "the ESA does not take precedence over [this] mandatory (non-discretionary) statutory mission." 86 Fed. Reg. at 4,822.

The 2021 Rule included an effective date of March 16, 2021. However, six weeks after issuing the 2021 Rule, the Service summarily issued the Delay Rule, which amended the 2021 Rule's effective date to April 30, 2021, and stated that further delays may be imposed. 86 Fed. Reg. at 11,892.  Plaintiffs promptly filed this challenge to the Delay Rule.

In issuing the Delay Rule—which amends the 2021 Rule, denies the public its urgently needed benefits, and extends the illegal 2012 Rule indefinitely—the Service violated the Administrative Procedure Act ("APA") by not providing the public with notice and an opportunity to comment, and not waiting thirty days before implementation. The Service's vague, speculative rationales for not complying with these requirements fall far short of the applicable good cause standard, which is "narrowly construed and only reluctantly countenanced," *Mack Trucks, Inc. v. EPA.*, 682 F.3d 87, 93 (D.C. Cir. 2012), and demands concrete, "factual findings," *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014). Indeed, the Service concedes that the Delay Rule, at base, "is for the purpose of reviewing any questions of fact, law, and policy that are raised by [the 2021 Rule] as well as the effect of the delay." 86 Fed. Reg at 11,893.

In other words, the Service claims that good cause exists to bypass rulemaking requirements because immediately implementing the Delay Rule will allow the Service to determine the effect of delay. This circular logic could not pass the most deferential of standards, let alone the "strict scrutiny" required where an agency foregoes rulemaking requirements. *Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 816-17 (D.C. Cir. 1983). The exigent circumstances required to establish good cause are not present in the routine situation where, as here, a new Presidential administration wants to review a duly promulgated rule. *See, e.g.*, *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 204-05 (2d Cir. 2004). A change in Administration does not give the Service the power to reimpose significant economic dislocation by fiat. Rather, the Service must turn "square corners in dealing with the people," including by going through full notice and comment. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (quotations omitted).

The Service also violated the APA's substantive requirements by failing to provide a reasonable, lawful explanation of for delaying the 2021 Rule, the implementation of which the Service recently found to be called for by both the ESA and the O&C Act. For these reasons, the Delay Rule should be set aside, and the 2021 Rule reinstated effective March 16, 2021.

## II.    BACKGROUND

### A.    Plaintiffs

Plaintiffs are AFRC, a forest products trade association that represents approximately 50 lumber and plywood manufacturing companies and landowners throughout the states of Washington, Oregon, California, and other western states; AOCC, an association whose members are 15 counties in western Oregon containing O&C Lands managed by the U.S. Bureau of Land Management ("BLM"); Douglas County, Oregon; Lewis County, Washington; Skamania County, Washington; and Siskiyou County, California. All four counties include lands that would be managed by the Forest Service and BLM for sustained timber production but for being designated as NSO critical habitat. Douglas County and AOCC's other members (Klamath, Curry, Coos, Clackamas, Lincoln, Linn, Polk, Yamhill, Marion, Columbia, Washington, Tillamook, Jackson and Josephine Counties) are each entitled to a percentage share of timber harvest revenues on the 2.1 million acres of O&C lands. Therefore, each is adversely affected by the continuing designation of every acre of the almost 1.4 million acres of O&C land designated as critical habitat under the Delay Rule.

All Plaintiffs are harmed by the Delay Rule, which delays implementation of the 2021 Rule and thereby extends the 2012 Rule's sweeping, unlawful critical habitat designation. Plaintiffs have standing to challenge the Delay Rule for the same reasons that the D.C. Circuit found that Plaintiff AFRC had standing to challenge the 2012 Rule, among other reasons. As the court

explained, "[w]hen the Government adopts a rule that makes it more difficult to harvest timber from certain forest lands, lumber companies that obtain timber from those forest lands may lose a source of timber supply and suffer economic harm." *Carpenters Indus. Council*, 854 F.3d at 2. The Delay Rule does exactly that by delaying the 2021 Rule and extending the 2012 Rule. The 2012 Rule designated as critical habitat approximately 1,373,693 acres of O&C Lands that Congress committed to "permanent forest production on a sustained yield basis" and approximately 2,077,697 acres of Forest Service matrix and Harvest Land Base lands that the Northwest Forest Plan designated for timber production. As the D.C. Circuit explained, the designation of these lands as critical habitat "will likely cause a decrease in the supply of timber from designated forest lands." *Id.* at 6; *see also id.* at 2 ("The critical habitat designation means that a huge swath of forest lands in the Pacific Northwest will be substantially off-limits for timber harvesting.").

AFRC's members include lumber companies that obtain their supply of timber from those forest lands and are harmed by their designation as critical habitat. Decl. of A. Geissler at ¶¶ 43-44. Consultation required by the 2012 Rule has caused severe delays to forest management projects. *Id.* at ¶¶ 33-43. For example, during the catastrophic 2020 wildfire season, projects that had been delayed by the 2012 Rule burned, resulting in irretrievable loss of owl habitat and of timber under contract. *See id.*; Compl. at ¶¶ 10, 12; Decl. of T. Freeman at ¶¶ 16-18. Other projects have been delayed or cancelled as a direct result of the 2012 Rule and, in some instances, the delays resulted in deterioration and loss of otherwise valuable timber. Compl. at ¶¶ 10, 12; Decl. of T. Freeman at ¶ 13; Decl. of C. Cadwell at ¶ 9; Decl. of A. Geissler at ¶¶ 33-37. As in the *Carpenters Industrial Council* case, "the decrease in the supply of timber from those designated lands is substantially probable to cause those lumber companies economic harm." 854 F.3d at 7.

Plaintiff AOCC's members and Plaintiff Douglas County are also harmed by the Delay Rule, which deprives them of receipts from timber sales as promised by the O&C Act. Decl. of T. Freeman at ¶¶ 9-13; Decl. of C. Cadwell at ¶¶ 6-14. The designation of O&C lands has caused federal timber sales on those lands to plummet, resulting in significant economic harm to AOCC's members and Douglas County. *Id.*; Compl. at ¶¶ 15-18. The relief requested by Plaintiffs will redress that harm by ensuring that the Secretary sets aside the Delay Rule and manages the O&C Lands in accordance with the O&C Act for the intended purpose of permanent forest production on a sustained yield basis with the required statutory minimum level of timber harvest. *See* Decl. of C. Cadwell at ¶¶ 6-11 (explaining that critical habitat designation "effectively curtails sustained yield management"). This relief will ensure that AOCC's members and Douglas County receive the receipts from timber sales promised by the O&C Act and will thereby help provide for the economic stability and development of the O&C Counties, as contemplated by the O&C Act. Similarly, Plaintiffs Lewis County, Skamania County, and Siskiyou County are harmed by the continued designation as critical habitat of federal land within their counties, which reduces timber harvest volumes in these areas and causes job and revenue losses. Compl. at ¶¶ 19-25; Decl. of G. Stamper at ¶¶ 6-10, 13-16, 18-19; Decl. of A. Davis at ¶¶ 2-4, 13-14.

In addition to being harmed by the Delay Rule due to reduced timber activity, all Plaintiffs are harmed by the increased wildfire threat caused by the Delay Rule's continued designation of timberland, which delays much-needed fuel reduction projects. Compl. at ¶¶ 12, 22-25; Decl. of T. Freeman at ¶¶ 14-18; Decl. of A. Geissler at ¶¶ 34-36; Decl. of A. Davis at ¶¶ 5-9, 13-14. For all of these reasons, Plaintiffs have standing to challenge the Delay Rule.

### B.    Legal Background

### 1.    Endangered Species Act

Enacted in 1973, the ESA seeks to conserve animal species that are at risk of extinction. *See* 16 U.S.C. §§ 1531 *et seq.* The Act authorizes the Secretary of the Interior to list terrestrial species that are endangered or threatened, and to protect those species' habitats. *See id.* § 1533; 50 C.F.R. § 402.01(b). The Secretary has delegated ESA duties to the Service, which is responsible for listing species as endangered or threatened.

When the Service lists a species as endangered or threatened, it must also "designate any habitat" of the species "which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A)(i). The Act defines "critical habitat" to include the "specific areas within the geographical area occupied by the species, at the time it is listed" or the "specific areas outside the geographical area occupied by the species at the time it is listed" if such areas are determined to be "essential for the conservation of the species." *Id.* § 1532(5)(A)(i)-(ii). Under section 4(b)(2) of the ESA, critical habitat designations may only be made "after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2). The Secretary may exclude an area from critical habitat upon determining that the benefits of such exclusion outweigh the benefits of designating such area as critical habitat, unless the Secretary determines, based on the best scientific data available, that the failure to designate such area as critical habitat will result in the extinction of the species. *Id.* § 1533(b)(2). Designation of land as critical habitat triggers certain consultation requirements under Section 7 of the Act. Any federal agency seeking to authorize, fund, or carry out an action on designated land must first consult with the Service to ensure that the action is "not likely to ... result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2).

Under the Supreme Court's unanimous decision in *Weyerhaeuser Co. v. U.S. Fish and Wildlife Service*, 139 S. Ct. 361 (2018), "Section 4(a)(3)(A)(i) does not authorize the Secretary [of the Interior] to designate [an] area as *critical* habitat unless it is also *habitat* for the species." *Id.* at 368 (emphasis in original) (citing 16 U.S.C. § 1533(a)(3)(A)(i)). In other words, "[o]nly the 'habitat' of [an] endangered species is eligible for designation as critical habitat," not areas that might develop into habitat in the future, even if the Service believes designation of such areas to be "essential for the conservation of the species." *Id. Weyerhaeuser* also ruled that ESA Section 4(b)(2) "imposes a categorical requirement that the Secretary tak[e] into consideration economic and other impacts before" designation of critical habitat. *Id.* at 371 (quotations omitted).

### 2.    The O&C Lands Act

In the 1800s, Congress established a land grant to the Oregon and California Railroad Company in exchange for construction of a rail line from the Columbia River in Oregon to California. Administration of the grant was rife with fraud, leading Congress to authorize the Attorney General to seek reverter. *See Oregon & Cal. R.R. Co. v. United States*, 238 U.S. 393 (1915). In 1916, Congress passed the Chamberlain-Ferris Revestment Act, which revested approximately 2.2 million acres of these lands ("O&C Lands") back to the United States. A smaller amount of land—approximately 93,000 acres—associated with the Coos Bay Wagon Road was similarly revested by Congress in 1919, 40 Stat. 1179, and this land is subject to the same management requirements as are O&C Lands.

In 1937, Congress passed the O&C Act, 43 U.S.C. §§ 2601 *et seq.* The Act provided for permanent forest production on a sustained-yield basis, which would lead to protection of watersheds and regulation of stream flow and contribute to the economic stability of local communities and the timber industry. The Act included provisions for reimbursing the counties in

which O&C Lands are located for the loss of tax revenues from O&C Lands. The Act was a revolutionary moment in forest management, as it reflected a new philosophy applying forest science to enable timber supply at a constant level, while ensuring renewal of the land and resource.

The O&C Act provides that O&C Lands "shall be managed … for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." 43 U.S.C. § 2601. The Act also requires that "[t]he annual productive capacity for such lands shall be determined and declared," and "timber from said lands in an amount not less than one half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." *Id.* To provide a reliable stream of income to the O&C counties, the O&C Act mandated that 50 percent of the gross revenues from timber sales on the O&C Lands be paid to the counties, *id.* § 2605(a), and that an additional 25 percent of the gross revenues be paid to the counties under certain conditions, *id.* § 2605(b). The remaining 25 percent of gross revenues goes to the government to cover the administrative cost of running the sale program. *Id.* § 2605(c).

Most O&C Lands are presently administered by BLM. The O&C Act requires that BLM classify O&C Lands as timberlands and manage these lands for "permanent forest production" and that timber on the lands "be sold, cut, and removed in conformity with the princip[le] of sustained yield." *Id.* § 2601.

### C.      Factual and Procedural Background

#### 1.      Listing Decision and 1992 Critical Habitat Rule

The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, nocturnal bird that inhabits western coniferous forests from British Columbia to mid-California. In 1990, the Service listed the NSO as a threatened species under the ESA. 55 Fed. Reg. 26,114 (June 26, 1990). In 1992, the Service first designated 6.8 million acres as critical habitat for the NSO. 57 Fed. Reg. at 1,800-11. This included 2.2 million acres in Washington, 3.3 million acres in Oregon, and 1.4 million acres in California. *Id.*

Since the NSO was listed as a threatened species, approximately 500 sawmills in the Pacific coast region from the Canadian border to mid-California have been forced out of business, destroying over 33,000 mill jobs and thousands more beyond the mills. Compl. ¶ 55. These mill closures, primarily a result of federal agency regulations intended to protect the NSO, have caused lasting economic harm to dozens of rural communities dependent on timber provided from federal land managed by the U.S. Forest Service and BLM.

#### 2.      Management of Federal Lands by the Forest Service and BLM

In 1993, President Clinton announced the Northwest Forest Plan as a "compromise" solution to the economic crisis created by the ESA listing of the NSO. The Secretaries of Agriculture and Interior adopted the Northwest Forest Plan in 1994. The Plan "introduced a system of reserves where conservation of late-successional forest, riparian habitats, northern spotted owls, and other species dependent on older forest would be the priority, and matrix areas where timber harvest would be the goal." 2012 Rule, 77 Fed. Reg. at 71,880 (emphasis added). Under the Northwest Forest Plan, nearly four million acres, representing just 16 percent (one-sixth) of the federal forest land within the range of the NSO, were designated as matrix lands to provide a steady

supply of federal timber to the local lumber-based economy. The original matrix lands consisted of approximately 3.28 million acres of National Forests and just under 700,000 acres of BLM-administered lands.

As a result of the Service's habitat designation, BLM, the Forest Service, and other agencies responsible for managing federal forest lands must consult with the Service to ensure that any action that they take—including approving the harvest of timber for sale from Forest Service matrix and BLM Harvest Land Base lands—will not result in destruction or "adverse modification" of designated critical habitat. BLM also is tasked with managing a portion of its lands in compliance with O&C Act. The O&C Act's mandate for sustained yield forestry requires a cyclical style of management that includes thinning treatments to encourage growth and regeneration treatments to capture timber volume and reestablish a new cohort of trees. In the view of the Service, both treatments often conflict with the habitat needs of the NSO.

BLM is required to develop resource management plans ("RMPs") to guide its management of the public lands. *See* 43 U.S.C. § 1712. BLM amended its RMPs for Western Oregon in 2016. These amendments decreased the area dedicated to sustained-yield timber management to a Harvest Land Base of about 469,000 acres, or 19% of BLM lands in Western Oregon. The combined HLB and Forest Service matrix shrank to about 3.75 million acres, or only 15% of the 24.4-million-acres originally within the NWFP. Because the RMPs "prohibit the selling, cutting, and removing of timber in conformity with the principle of sustained yield on portions of O&C timberland," this Court determined that they violate the mandatory directives of the O&C Act. *AFRC v. Hammond*, 422 F. Supp. 3d 184, 189 (D.D.C. 2019). A ruling on remedy issues is pending.

### 3.    2008 and 2012 Critical Habitat Rules

In 2002, the 1992 NSO critical habitat designation was challenged, and the Service ultimately settled the case by agreeing to complete a rulemaking to consider revising the NSO critical habitat. *See W. Council of Indus. Workers v. Sec'y of Interior*, Civ. No. 02-6100-AA (D. Or.). Pursuant to this settlement, the Service published a revised critical habitat rule on August 13, 2008, which designated 5,312,300 acres of federal land as critical habitat, and also issued a recovery plan for the NSO. 2008 Rule, 73 Fed. Reg. 47,326.

Several of the same plaintiffs who had challenged the 1992 designation again sued to overturn the 2008 Rule, as did environmental groups. *See Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 130 (D.D.C. 2010). In March 2009, the Service sought voluntary remand of the 2008 critical habitat designation and recovery plan, which the court granted. *Id.* at 134. The Service also completed a new recovery plan in 2011.

In December 2012, the Service designated 9,577,969 acres in California, Oregon, and Washington as critical habitat for the NSO, over 4.25 million more acres than designated by the 2008 Rule. 2012 Rule, 77 Fed. Reg. at 71,876. The 2012 Rule designated approximately 1.2 million acres of land that the Service conceded were not NSO habitat, but only "younger forest" "areas anticipated to develop into suitable habitat in the future." 77 Fed. Reg. at 72,026.

### 4.    2021 Critical Habitat Rule

The Service issued its most recent revision to the NSO critical habitat designation, the 2021 Rule, following the settlement of a long-running challenge to the 2012 Rule brought by a coalition of counties, trade associations, and timber companies, including several of the Plaintiffs here. Consistent with the settlement agreement in the challenge to the 2012 Rule, on August 11, 2020, the Service proposed revising the 2012 Rule to exclude areas pursuant to section 4(b)(2) of the

ESA. 85 Fed. Reg. 48,487-01 (Aug. 11, 2020). The proposal explained that the exclusions were "based on new information that has become available since [the Service's] 2012 revised critical habitat designation for the northern spotted owl." *Id.* at 48,487.

The proposal sought public comments concerning the reasons why the Service should or should not exclude areas as critical habitat; any additional areas that should be considered for exclusion and any probable economic, national security, or other relevant impacts of excluding those areas; any National Forest System lands that should be considered for exclusion and any probable economic, national security, or other relevant impacts of excluding those areas; any significant new information or analysis concerning economic impacts that should be considered in the balancing of the benefits of inclusion versus the benefits of exclusion in the final determination; and whether the ongoing litigation challenging BLM's management of O&C Lands should be addressed in the final rule. *Id.* at 48,488. The Service received over 500 comment letters on the proposed rule, including comments from many of the Plaintiffs here. The comments included a full economic analysis of the effect of the 2012 Rule. Ex. D. to Decl. of A. Geissler. This analysis determined that the imposition of critical habitat over uninhabited matrix/HLB areas would cause up to $1.2 billion in timber harvest losses over 20 years, and annual economic losses of $97 million. *Id.* at 67-68.

On January 15, 2021, the Service issued its final rule, which excluded approximately 3,472,064 acres in California, Oregon, and Washington, under section 4(b)(2) of the ESA, effective March 16, 2021, for a total of 6,105,279 acres of designated critical habitat. 86 Fed. Reg. at 4,820. The Service explained that the exclusions are based on "reconsideration of the relevant impacts under section 4(b)(2) of the Act as well as new information since our 2012 revised critical habitat designation for the northern spotted owl." *Id.* The size of the revised designation is comparable to

the 6,887,000 acres of NSO critical habitat originally designated by the Service in 1992, 57 Fed. Reg. at 1,800-11, and more than the 5,312,300 acres of habitat designated by the Service in 2008, 73 Fed. Reg. at 47,326. In fact, the 2021 Rule designates more critical habitat within National Forests than either the 1992 or 2008 rules.

The 2021 Rule excluded 1,373,693 acres of O&C Lands, which the Service determined was appropriate because "[t]he O&C Act provides, and the courts have confirmed, that the primary use of these revested timberlands is for permanent forest production on a sustained yield basis." 86 Fed. Reg. at 4,822; *see, e.g.*, *AFRC v. Steed*, No. 16-1599-RJL, 2019 WL 1440887, at *4 (D.D.C. Nov. 22, 2019). The Rule also excluded approximately 2,077,697 acres of Forest Service matrix lands that are designated for timber production under the Northwest Forest Plan. 86 Fed. Reg. at 4,839. In deciding to exclude all BLM O&C Lands and some Forest Service matrix lands from the critical habitat designation, the Secretary examined the benefits of including and the benefits of excluding these lands and determined the benefits of exclusion outweigh the benefits of inclusion, and that exclusion would not result in the NSO's extinction. *Id.* at 4,839-40.

The Service explained that "[e]ven after excluding these lands, there remain approximately 6,105,279 acres of designated critical habitat as well as several million additional acres of protected habitat for the northern spotted owl in designated wilderness and National Parks, throughout the owl's range. Although the excluded areas provide some conservation value, the Secretary has determined that the benefits of excluding the O&C lands, given their mandated primary use for timber harvest, and the [Northwest Forest Plan] matrix lands, given their multiple-use values, outweigh the value of their inclusion as critical habitat." *Id.* at 4,840. The Service further explained that a benefit of exclusion is that it allows "management practices to protect forested lands from catastrophic wildfire," which destroy NSO habitat. *Id.* at 4,843.

15

### 5. Defendants issue the Delay Rule without notice and comment, effective immediately.

Six weeks after the promulgation of the 2021 Rule, and just 16 days before it was scheduled to go into effect, Defendants abruptly reversed course. The Service and Interior issued the Delay Rule, which changed the effective date of the 2021 Rule from March 16, 2021, to April 30, 2021, and indicated that further delay may follow. 86 Fed. Reg. at 11,892.

Defendants did not provide the public with notice or an opportunity to comment on the Delay Rule, or comply with the APA's 30-day wait requirement. *Id.* at 11,893. The Service claimed that "the totality of the circumstances here—the history of litigation and newly threatened suits, the potential for a 'logical outgrowth' problem in the final [2021] rule, and the threat to the Service's execution of its statutory functions, among other issues—indicate that there is good cause to forgo notice and comment procedures here because it is impractical and contrary to the public interest for the Service to provide notice and an opportunity to comment" and "that there is good cause to make the rule effectively immediately instead of waiting until 30 days after publication." *Id.* at 11,894.

### III.   STANDARD OF REVIEW

Plaintiffs' APA claims are subject to resolution by summary judgment motion. *See, e.g., Fund for Animals v. Babbitt,* 903 F. Supp. 96, 105 (D.D.C. 1995), *opinion amended* 967 F. Supp. 6 (D.D.C. 1997) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record . . . even though the Court does not employ the standard of review set forth in Rule 56 . . . ."). Though the Service has not yet filed the full administrative record, there are no material disputed facts and the Court may rule prior to filing of the record or waive the record requirement. *See Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018). Further, LCvR (n)(1) requires

16

prompt filing of the record, which should not be voluminous given the sparseness of the Delay Rule and absence of a public comment and review period.

Pursuant to the APA, a reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "without observance of procedure required by law." *Id.* § 706(2)(D). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency reverses course from its previous position, it must provide a "reasoned analysis." *Id. at* 42, 57; *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (requiring a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by the prior policy") (quoting *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

While arbitrary and capricious review is deferential, an agency's decision to invoke the APA's good cause exception to notice and comment requirements is reviewed *de novo. Sorenson Commc'ns Inc.*, 755 F.3d at 706. The good cause inquiry is "meticulous and demanding." *Id.* (quoting *N.J. Dep't of Env't Protection v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980)). Indeed, the D.C. Circuit has described its review as "strict scrutiny." *Gorsuch*, 713 F.2d at 816-17. The agency bears the burden of persuasion in convincing a court that good cause exists, and the exception "not an escape clause that may be arbitrarily utilized at the agency's whim."*Tenn. Gas*

*Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting *Am. Fed'n of Govt. Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).

## IV.    ARGUMENT

### A.    The delay rule violates the APA's procedural requirements.

In accordance with the APA's rulemaking requirements, the Service issued the 2021 Rule following a notice-and-comment rulemaking process involving extensive stakeholder participation and set the Rule's effective date two months out. By contrast, the Service issued the Delay Rule, which amended the 2021 Rule, without providing the public with notice and an opportunity to comment, effective immediately, in clear violation of the APA's procedural requirements. The Service should not be permitted to subvert the APA in this manner.

It is well established that the delay of an effective date is a substantive amendment subject to the APA's notice and comment rulemaking requirement. For example, in *Council of the Southern Mountains v. Donovan*, 653 F.2d 573, at 762-63 (D.C. Cir. 1981) (per curiam), the D.C. Circuit held that the agency's deferral of regulations pertaining to coal operators without notice and comment procedures violated the APA. The court reasoned that the delay "was a substantive rule since . . . it had had 'palpable effects' upon the regulated industry and the public in general." *Id.* Here too the Service's Delay Rule is a substantive because it amends an essential part of the 2021 Rule—its effective date—and has "palpable effects upon the regulated industry and the public in general." *Id.*; *see also Nat. Res. Def. Council v. EPA*, 683 F.2d 752, 761-62 (3d Cir. 1982) (explaining that "an effective date  . . . . is an essential part of any rule").

Specifically, the Delay Rule denies the regulated industry and the public, including Plaintiffs, the economic, safety, and environmental benefits of the 2021 Rule. *See* 86 Fed. Reg. at 4,834-41. Indeed, the Delay Rule not only places "a huge swath of forest lands in the Pacific

18

Northwest . . . substantially off-limits for timber harvesting," *Carpenters Indus. Council*, 854 F.3d at 2, but also interferes with fuel-reduction projects, thus increasing the risk of loss of life, property, and habitat. Due to these palpable effects, the Delay Rule is subject to the APA's procedural requirements, as the Service does not appear to dispute. *See also, e.g.*, *Gorsuch*, 713 F.2d at 814 (holding that EPA's postponement of the effective date of promulgated amendments was subject to notice and comment requirements); *Abraham*, 355 F.3d at 204-05 (holding that a 60-day delay of a regulation's effective date was a substantive rulemaking).

The APA requires agencies to engage in a notice and public comment process prior to formulating, amending, or repealing a rule. 5 U.S.C. §§ 551(5), 553. This process is designed to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). The APA also requires that a rule be published not less than thirty days before its effective date. *Id.* § 553(d). An agency may avoid the notice and comment requirement only if it "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). An agency may only avoid the 30-day notice requirement "for good cause found and published with the rule." *Id.* § 553(d)(3).

The D.C. Circuit has "repeatedly made clear that the good cause exception is to be narrowly construed and only reluctantly countenanced." *Mack Trucks, Inc.*, 682 F.3d at 93 (quotations omitted). In essence, the good cause exception "excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (internal citations omitted). The good cause exception is particularly limited where, as here, an agency is changing

an existing rule. The APA's notice and comment requirements are designed to ensure that "an agency will not undo all that it accomplished through its [earlier] rulemaking without giving all parties an opportunity to comment on the wisdom of repeal." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982).

The Service claims that "the history of litigation and newly threatened suits, the potential for a 'logical outgrowth' problem in the final [2021] rule, and the threat to the Service's execution of its statutory functions, among other issues—indicate that there is good cause to forgo notice and comment procedures here because it is impractical and contrary to the public interest for the Service to provide notice and an opportunity to comment on an extension of the effective date." 86 Fed. Reg. at 11,894. For similar reasons, the Service claims "that there is good cause to make the rule effectively immediately instead of waiting until 30 days after publication for it to become effective." *Id.* As explained below, each of these alleged justifications for issuing the Delay Rule without notice and comment, effective immediately, falls far short of the exacting good cause standard. Moreover, the Service simply cannot show good cause for failing to comply with the APA's rulemaking requirement based on a duly enacted rule's impending effective date of the agency's own choosing. The exigent circumstances required to establish good cause are not present in the routine situation presented, where a new Presidential administration would like to review or reconsider a rule promulgated by a previous administration.

1.    **The Service cannot show good cause because the alleged need to bypass rulemaking requirements was a product of the Service's own making.**

As an initial matter, the Service cannot establish good cause because the alleged urgent need to bypass rulemaking requirements is an emergency of its own making.

It is well established that "the mere existence of deadlines for agency action . . . (can) not in itself constitute good cause for a § 553(b)(B) exception." *Council of S. Mountains*, 653 F.2d at

20

581 (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979)). This is particularly true where, as here, the agency had time to comply with rulemaking requirements but did not.[1]  Here, the Service issued the 2021 Rule on January 15, 2021, providing *two months* before the rule became effective. To the extent that the notice of intent letters referenced in the Delay Rule have any relevance, the first was filed days later, on January 19, leaving the Service *55 days* to provide the public with notice and comment. Accordingly, the Service cannot establish good cause for failing to provide notice and comment because it had time to provide them but did not.

In similar circumstances, the Second Circuit invalidated a delay rule that the EPA issued without notice and comment, effective immediately, following a memorandum published by the White House at the outset of a new administration. *Abraham*, 355 F.3d at 206. The court ruled that the effective date was "an emergency of DOE's own making" and could not constitute good cause to dispense with notice and comment. *Id.* at 205 (citing *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (ruling that the imminence of a self-imposed deadline did not qualify as good cause)). Here too, the impending deadline was one of the Service's own choosing and thus cannot serve as a basis for dispensing with notice and comment.

Moreover, there was no "deadline" presented in the typical sense of that word. Rather, the Service faced a standard effective date of a duly enacted rule, which the Service had issued after considering hundreds of public comments and providing thorough explanation. In other words, as

---

[1] *See, e.g.*, *Nat. Res. Defense Council*, 683 F.2d at 765 (finding that "the imminence of a deadline or the 'urgent need for action' is not sufficient to constitute 'good cause' within the meaning of the APA, where it would have been possible to comply with [] the APA") (citation omitted); *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979) ("The expiration of the Stabilization Act was not so unexpected as would have precluded advance notice by the [agency] of its own proposed regulations" ) (quoting *Shell Oil Co. v. Fed. Energy Admin.*, 527 F.2d 1243, 1248 (Temp. Emer. Ct. App.1975)); *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 380 (3d Cir. 1979) ("We cannot. . . accept the Administrator's protestations that the statutory schedule precluded prior notice and comment.").

the Second Circuit put it in *Abraham*, "we fail to see the emergency." *Id.* Rather, this case, like *Abraham*, presents a routine situation where a new Presidential administration would like to review or reconsider a rule promulgated by a previous administration, which categorically does not justify bypassing the APA. "The only thing that was imminent" in *Abraham* and here "was the impending operation of a" law duly promulgated to serve the public interest, "which cannot constitute a threat to the *public* interest." *See id.* (emphasis in original). For this reason alone, the Service cannot demonstrate good cause for avoiding rulemaking requirements in order to amend the effective date of a duly enacted rule.

> **2.    The Service cannot show good cause because the Delay Rule is based on the irrational premise that an immediate delay is needed for the Service to determine whether the delay is merited.**

All of the Service's asserted good causes also fail at the outset because they are built on a fundamentally flawed premise. The Service concedes that the Delay Rule, at base, "is for the purpose of reviewing any questions of fact, law, and policy that are raised by [the 2021 Rule] as well as the effect of the delay." 86 Fed. Reg at 11,893. In other words, the Service asserts that good cause exists because immediately implementing the Delay Rule will allow the Service to determine the effect of the Delay Rule. This circular logic could not pass the most deferential of standards, let alone the strict scrutiny required where an agency foregoes rulemaking requirements. It is the type of "conclusory statement" that would allow the good-cause exception to swallow the notice and comment rule. *Mobil Oil Corp.*, 610 F.2d at 803 (citation omitted).

This statement also reveals a "significant mismatch" that undermines the Service's various other alleged justifications. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). The Service cannot rationally claim both that that it does not know whether the Delay Rule is merited or what its effect on the public will be, while at the same time asserting that good cause

exists to implement the Delay Rule immediately, without first taking the time to hear from the public. As in *Department of Commerce v. New York*, this mismatch reveals the Service's asserted good causes are "contrived," "more of a distraction," and thus lacking under any standard of review. *See id*. at 2575-76. While examination of the Service's other alleged reasons for denying the public notice and comment is therefore unnecessary, as explained below, each of those reasons fails to meet the good cause standard.

> ### 3. Alleged concern about a "potential" "notice-and-comment defect" of the 2021 Rule is not good cause to bypass notice and comment requirements.

The Service's reference to "the potential for a 'logical outgrowth' problem," which it characterizes as a "notice-and-comment defect," does not justify the Service bypassing the APA's notice and comment requirements. *See* 86 Fed. Reg. at 11,894. As a matter of law, concerns about the procedural adequacy of a prior rule do not constitute good cause to forgo notice and comment on a later amendment to that rule. The D.C. Circuit has explained, to allow otherwise would be "untenable because it would permit an agency to circumvent the requirements of [the APA] merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation. Such a holding would ignore the fact that the question whether the regulations are indeed defective is one worthy of notice and an opportunity to comment." *Consumer Energy Council of Am.*, 673 F.2d at 447 n.79.

In any case, the Delay Rule merely points to a "potential" procedural problem with the 2021 Rule, which is insufficient to establish good cause to forgo the APA's notice and comment requirements. Actual harm supported by concrete evidence is required. *Tenn. Gas Pipeline Co.*, 969 F.2d at 1144 (finding no good cause where the agency "provided little factual basis for its belief that pipelines will seek to avoid its future rule by rushing new construction and replacements

23

with attendant damage to the environment"); *Sorenson Commc'ns Inc.*, 755 F.3d at 706 (no good cause because "there were no factual findings supporting the reality of the threat" cited); *United States v. Cain*, 583 F.3d 408, 422 (6th Cir. 2009) (no good cause because the agency "gave no specific evidence of actual harm to the public in his conclusory statement of reasons"). The Service did not provide factual basis for its speculation that there is a "potential" logical outgrowth issue with the 2021 Critical Rule.

Nor could it. There is no logical outgrowth problem with the 2021 Rule. Under the logical growth doctrine, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). This ensures that a proposal for rulemaking provides adequate notice to interested parties such that they "have the opportunity to develop evidence in the record to support their objections to the rule." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Thus, "[a] final rule qualifies as a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019) (internal citations omitted); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009) ("[A] final rule represents a logical outgrowth where the [notice for proposed rulemaking] … made clear that the agency was contemplating a particular change.").

The 2021 Rule easily meets this test.  The proposed 2021 Rule made clear that the Service was considering additional exclusions. For example, the proposal stated that the final rule "may exclude additional areas if [the Service] find[s] that the benefits of exclusion outweigh the benefits of inclusion or may remove areas if [the Service] find[s] that the area does not meet the definition

of 'critical habitat.'" 85 Fed. Reg. at 48,488. The Service also made clear that it was considering "[w]hether and how on-going litigation challenging [BLM's] management of Oregon and California Railroad Revested Lands (O&C lands) should be addressed in our final rule." *Id.* The proposed rule further explained that "[c]hanges in a final revision would be reasonably anticipated if: (1) We base them on the best scientific and commercial data available and take into consideration the relevant impacts; (2) we articulate a rational connection between the facts found and the conclusions made, including why we changed our conclusion; and (3) we base removal of any areas on a determination either that the area does not meet the definition of 'critical habitat' or that the benefits of excluding the area will outweigh the benefits of including it in the designation." *Id.* Thus, the Service clearly stated that additional exclusions may be made in light of public comments, best scientific and commercial data, and the Services' obligations under the ESA and O&C Act.

The proposal also "expressly asked for comments" on additional exclusions, which provided further notice that additional lands could be excluded. *CSX Transp., Inc.*, 584 F.3d at 1081 ("[A] final rule represents a logical outgrowth where the [notice for proposed rulemaking] expressly asked for comments on a particular issue."); *see also City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007). The Service sought comment on, among other topics, "[a]ny additional areas, including Federal lands, that should be considered for exclusion under section 4(b)(2) of the Act" and "[s]pecifically, any National Forest System lands managed by the [Forest Service] that should be considered for exclusion . . . ." 85 Fed. Reg. at 48,488. Because the Service solicited comments on this very issue, interested parties could reasonably anticipate that additional acreage would be excluded.

Indeed, interested parties *did* anticipate that additional areas, including Northwest Forest Plan and O&C lands, could be excluded by the Final Rule. *See, e.g.*, *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998) (finding no logical outgrowth problem because "[c]ommenters clearly understood that these technologies were under consideration, as the agency received comments on them from several sources"). As the final 2021 Rule notes, "commenters requested exclusion of all [Northwest Forest Plan] matrix lands as part of the public comments on the proposed rule, illustrating that the public was on fair notice that the exclusions in the final rule could be expanded." 86 Fed. Reg. at 4,839. Moreover, the public submitted comments on the same issues in addressing the proposed 2012 Rule, which the proposed 2021 Rule set out to revise.[2] "[T]his kind of agency modification of a proposed rule, in response to the comments it solicited

_____

[2] 77 Fed. Reg. at 72,006 ("Numerous State commenters (CALFIRE, Oregon Department of Forestry, Washington Department of Fish and Wildlife, Washington Department of Natural Resources), Federal (USFS, BLM), and public commenters disagreed with the need to include public lands including Federal lands (e.g., 'matrix' land, adaptive management areas, experimental forests, O&C Lands, and congressionally reserved wilderness areas, national scenic areas, and national parks), State lands (e.g., State parks, State forests, State forest trust lands), and county lands in the final rule for a variety of reasons, including additional and redundant regulatory burdens and requirements, economic and social impacts, potential inconsistency with existing laws and policy, existing protections, a lack of additional conservation benefits, limits on research or needed management activities (e.g., fuel reduction, restoration, or insect control), mapping errors, insufficient justification supporting inclusion, and potential disincentives for preserving habitat."); *id.* at 72,007 ("We recognize the concern over the inclusion of certain Federal lands in the designation of critical habitat for the northern spotted owl, and particularly of lands in the matrix land use allocation or the O&C lands."); *id.* at 72,010 ("One commenter stated that the O&C Act limits the authority of the Service in designating critical habitat."); *id.* at 72,019 ("Several commenters stated that the rule needs to be more explicit about how it relates to the NWFP, and that the NWFP should direct the management of the critical habitat lands."); *id.* at 72,032. ("One comment states that designating O&C lands as critical habitat is inconsistent and in direct conflict with the statutory provisions of the O&C Act and Sec. 701(b) of FLPMA . . . . ('O&C lands' refers to certain areas in western Oregon established under the O&C Act of 1937, and 'O&C' counties represent those counties containing O&C lands). The Association of O&C Counties asserts that the proposed critical habitat designation will prevent 18 O&C counties from receiving sufficient revenues on a sustainable basis as required by the O&C Act, and will result in employment and income impacts on a local and regional scale.").

and received on alternative possibilities, complies with the requirements of administrative law." *Appalachian Power Co.*, 135 F.3d at 816.

Finally, the extent of the 2021 Rule's critical habitat designation was reasonably foreseeable because it was within the scope of previous designations. *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 210 (D.C. Cir. 2007) (finding that a final rule "was reasonably foreseeable and hence satisfied the logical outgrowth test"). As the Service noted in its proposed rule, NSO critical habitat was first designated in 1992 and has been modified several times in the subsequent decades. 85 Fed. Reg. at 48,487. The total designated critical habitat in the 2021 Rule (more than 6.1 million acres) is not unprecedented; in fact, it falls squarely between the total acreage designated by the 1992 and the 2008 Rules (6.8 million and 5.3 million acres respectively).

In sum, the proposal stated that the final rule may exclude additional areas, requested comments on additional areas to exclude, the public submitted comments regarding the additional areas that were excluded, and the final 2021 Rule designation was of a similar size as previous designations. Given these circumstances, the 2021 Rule clearly satisfied the logical outgrowth test. Unfounded concerns about the "potential" it did not do not constitute good cause for the Service's decision to bypass the APA's notice and comment requirements in issuing the Delay Rule.

### 4.  The "history of litigation and newly threatened suits" are not good causes.

The Service's asserted justification of "the history of litigation and newly threatened suits" is also inadequate. In *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 970 (9th Cir. 2015) (en banc), the Ninth Circuit rejected a similar rationale for an agency's change of course regarding the exemption of a national forest from the roadless rule. The Forest Service cited "litigation over the last two years" as a justification for its decision, among other reasons.

The Ninth Circuit found this litigation rationale inadequate even under the APA's deferential arbitrary and capricious standard, noting that, "[a]t most, the Department deliberately traded one lawsuit for another." *Id.* The same is true here, as this lawsuit demonstrates. In fact, as the Service acknowledges in the 2021 Rule, it sought to amend the 2012 Rule as a result of a settlement, which this Court approved, of a lawsuit challenging the 2012 Rule filed by several of the Plaintiffs here. The Delay Rule reinstates that same, unlawful 2012 Rule, reopening that litigation. The fact that additional ESA citizen suit lawsuits are now threatened by other groups, as opposed to filed, is a distinction without significance.

Moreover, the Service only says that these threatened lawsuits raise "questions [about whether] the 2021 rulemaking was procedurally adequate." 86 Fed. Reg. at 11,893; *see also id.* at 11,894 ("[W]e have received [notices of intent ('NOIs')] that, among other things, raise a substantial allegation of a notice-and-comment defect in the January 15, 2021, Final Rule. Upon initial review of the NOIs, the Service has concluded that it needs additional time to review the allegations in the NOIs to determine whether they have merit."). "Questions," "potential defects," and "allegations," are not good causes for failing to comply with the APA's notice-and-comment requirements. *See, e.g.*, *Sorenson Commc'ns Inc.*, 755 F.3d at 706 (finding no good cause because "there were no factual findings supporting the reality of the threat" cited and the agency only conjectured that "there *could* be" a concern) (emphasis in original). In any case, as explained above, there is no logical outgrowth problem with the 2021 Rule and, even if there were, procedural defects of a past rule are categorically not good cause for bypassing notice and comment in issuing a subsequent rule.

Accordingly, past and threatened litigation regarding a potential notice-and-comment defect does not excuse the Service's failure to provide notice and comment on the Delay Rule.

5.    **The ESA's "conservation purpose" and unexplained concern about "preventing the Service from performing its functions" do not establish good cause.**

The Service also claims that "provid[ing] for public notice and comment would prevent the Service from performing its functions, create confusion and disruption in the ESA section 7(a)(2) consultation process, and thwart the conservation purposes of the Act." 86 Fed. Reg. at 11,893. These largely unexplained concerns with the ESA's purpose and "disruption" also fail to justify denying the public notice and comment.

To begin, it is well established that an agency cannot show good cause by restating a statute's purpose. Rather, an agency must provide independent evidence that the harm the statute seeks to prevent will actually result if notice and comment is provided. *See, e.g.*, *Tenn. Gas Pipeline Co.*, 969 F.2d at 1145 (finding no good cause where the agency "provided little factual basis for its belief that pipelines will seek to avoid its future rule by rushing new construction and replacements with attendant damage to the environment"); *United States v. Valverde*, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers . . . that Congress had sought to prevent when it enacted SORNA.").

Consistent with these cases, the Service's vague references to the ESA's "conservation purposes" do not establish good cause. Congress passed the ESA to protect species at risk of extinction, not to provide a tool for broader conservation goals. The most the Service offers with respect to impacts on the NSO is that, "if the January 15, 2021, final exclusions from designated critical habitat of more than 3 million acres of northern spotted owl habitat become effective, there is the *potential* that we will not have met our obligations under the Act to provide required protections for listed species." 86 Fed. Reg. at 11,893-94 (emphasis added). Again, the Service's unexplained invocation that it has "potential[ly] . . . not . . . met [an] obligation[]," *id.*, is not good

29

cause for failing to provide notice and comment. *See, e.g.*, *Tenn. Gas Pipeline Co.*, 969 F.2d at 1145. This justification rings especially hollow given that, following extensive notice and comment, the Service just recently found that the 2021 Rule's exclusions are consistent with the ESA and will not cause the NSO's extinction. 86 Fed. Red. at 4,820.

Further undermining claimed good cause based on the ESA's "conservation purpose" is the fact that the ESA (and, as explained below, the O&C Act) *compel* much of the 2021 Rule. Implementing the 2021 Rule is required under the ESA given the Service's determination pursuant to ESA section 4(b)(2) that the benefits to the public of exclusion outweigh the benefits to the NSO of inclusion, and that exclusion will not cause the species' extinction. The Service's suggestion that "excluding areas from critical habitat is not required by the ESA" but instead committed to the Secretary's "discretion," 86 Fed. Reg. at 11,894, is not only beside the point but also misstates the law. The Supreme Court unanimously rejected this view in *Weyerhaeuser*. The Court ruled that "Section 4(b)(2) requires the Secretary to consider economic impact and relative benefits before deciding whether to exclude an area from critical habitat or to proceed with designation," and that a decision not to exclude areas from a critical habitat designation is subject to "routine" APA review. 139 S. Ct. at 370-71.

The Service's assertion that good cause exists based on the ESA's intent and its related statement that NSO "habitat is defined by forested stands, particularly of older trees" that "cannot be replaced for many decades once removed," also ignore another reason why the 2021 Rule's exclusion of certain areas was required. The 2012 Rule, which the 2021 Rule amends, designated at least 1.2 million acres of land that the Service conceded *was not NSO habitat*, but only "younger forest" "areas anticipated to develop into suitable habitat in the future." 77 Fed. Reg. at 72,026. In *Weyerhaeuser*, the Supreme Court also unanimously rejected the Service's longstanding practice

of designating land that might develop into habitat in the future if the Service believed designation of such areas to be "essential for the conservation of the species." The Court ruled that "Section 4(a)(3)(A)(i) does not authorize the Secretary [of the Interior] to designate [an] area as *critical habitat unless it is also habitat* for the species." 139 S. Ct. at 368 (emphasis in original) (citing 16 U.S.C. § 1533(a)(3)(A)(i)). In issuing the 2012 Rule, the Service followed this same, unlawful practice, resulting in the designation of over a million acres of non-habitat. Looking to Forest Service matrix lands alone, the Service explained that that "*approximately 1.1 million acres [designated under the 2012 Rule] are predominantly younger forests (considered to be unoccupied)* and 1.6 million acres are northern spotted owl habitat." 77 Fed. Reg. at 72,028 (emphasis added). Accordingly, the purposes of the ESA and the Service's obligations under the law do not justify its failure to provide notice and comment in issuing the 2021 Rule.

The Service also suggests that denying the public notice and comment was necessary to prevent agency "confusion and disruption in the ESA section 7(a)(2) consultation process" that would "also affect[] third parties reliant on Federal agency activities." 86 Fed. Reg. at 11,894. Courts have precluded efficiency goals and concern for agency convenience from qualifying as good cause. *See, e.g., Chamber of Comm. of United States*, 443 F.3d at 908.

The notion that the Service has prevented "confusion and disruption" and increased certainty for "third parties" by denying the public notice and comment is absurd. Denying third parties notice and the opportunity to comment *increases* uncertainty, confusion, and disruption. So does the Delay Rule's temporary status and its reopening of conflict over the unlawfulness of the 2012 Rule. The Delay Rule denies the public the certainty of the duly enacted 2021 Rule, replacing it with a statement that excluded areas may be "potentially included again." 86 Fed. Reg. at 11,894. This statement is not certainty-enhancing guidance at all and, even if it were, "a desire

31

to provide guidance to regulated parties is not sufficient to show good cause to bypass the notice and comment provisions of the APA." *Cain*, 583 F.3d at 421. To the extent the Service suggests that "third parties" who rely on federally approved timber harvests, including Plaintiffs here, are benefited by keeping the 2012 Rule in place, the asserted justification is even more absurd. A primary basis of the 2021 Rule was that excluding the identified areas will benefit such parties and the larger public (and likely the NSO and other species) by facilitating timber harvests and fuel reduction projects in those areas.

### 6. The Service also failed to establish good cause for waiving the APA's 30-day wait requirement.

For similar reasons, the Service "also [found] that there is good cause to make this rule effective immediately instead of waiting until 30 days after publication for it to become effective." 86 Fed. Reg. at 11,894; *id.* (Providing the 30-day grace period "would mean that the January 15, 2021, Final Rule would go into effect on March 16, 2021," which "would create the same issues as discussed in the preceding paragraphs."). Even assuming that the test for good cause to waive the 30-day rule is less stringent than to waive notice and comment, the Service's justifications fail to meet any good cause standard for the same reasons discussed above. *See Am. Fed'n of Gov't Emp., AFL-CIO*, 655 F.2d at 1156 (recognizing that "different standards govern the applicability of the good cause exceptions" but that both "exceptions to the provisions of section 553 will be narrowly construed and only reluctantly countenanced" (citation omitted); *Cain*, 583 F.3d at 423-24 (acknowledging that the two standards are different but rejecting both claims of good cause on similar grounds).

The only additional reason the Service offered for not meeting the 30-day requirement was that allowing the Delay Rule "to go into effect immediately . . . preserves the status quo, and there is no change to which parties would need time to adjust their behavior." 86 Fed. Reg. at 11,894.

This reason also falls short. Accepting it would mean that an agency could always bypass the 30-day rule in extending effective dates and other deadlines so as to preserve "the status quo," improperly creating an exception "that would swallow the rule." *Mobil Oil Corp.*, 610 F.2d at 803 (citation omitted). This rationale is also unfounded factually. Absent the Delay Rule, the 2021 Rule would be in effect, which the public has counted on. In this sense, the Delay Rule does change the status quo and, in doing so, threatens to delay or prevent timber harvests and fuel reduction projects on lands that are not occupied by the NSO and, in many cases, are not habitat.

**B.      The Delay Rule violates the APA's substantive requirements.**

The Delay Rule also violates the APA because it is arbitrary and capricious, running counter to the evidence and entirely failing to consider important aspects of the problem. The Service purported to justify the Delay Rule as necessary for the agency to review "whether the [2021 Rule] was procedurally adequate" "[i]n light of the litigation history of northern spotted owl critical habitat designations, the clear intentions from some parties to file suit to challenge the January 15, 2021, Final Rule, and other questions raised." 86 Fed. Reg at 11,893. As explained above and other courts have held, "litigation" is not a reasoned explanation for changing course on a duly enacted rule. *Organized Vill. of Kake*, 795 F.3d at 970 (finding a justification based on "litigation over the last two years" to be implausible). This is particularly true where, as here, the agency does not claim that newly threatened litigation is meritorious. Rather, the Service only says that threatened lawsuits raise questions about "the potential for a 'logical outgrowth' problem." 86 Fed. Reg at 11,894. And, as explained above, there is no logical outgrowth problem—the proposed 2021 Rule clearly stated that additional exclusions may be made, invited comment on that issue, and then received responsive comments.

The Service also violated the APA in issuing the Delay Rule by "entirely fail[ing] to consider an important aspect of the problem," including the consequences of delay. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. For example, the Service failed to address the adverse effects the delay in implementing the 2021 Rule would have on Plaintiffs and others who obtain timber from forest lands that remain designated as critical habitat for the NSO; the benefits to the NSO and the public enabled by more active management of excluded timberlands to suppress catastrophic wildfires; the fact that the 2012 Rule unlawfully designated land that is not NSO habitat; the 2021 Rule's acknowledgement that exclusions are appropriate in light of the O&C Lands' "mandated primary use for timber harvest"; or the 2021 Rule's acknowledgement that the Economic Analysis for the 2012 Rule is outdated and that exclusions are appropriate under ESA section 4(b)(2). Accordingly, the Delay Rule is arbitrary and capricious agency action.

## C.   The Delay Rule violates the O&C Act's sustained yield mandate.

By continuing the 2012 Rule, the Delay Rule also violates the O&C Act. As noted, the O&C Act requires lands subject to the Act to be devoted to "permanent forest production." 43 U.S.C. § 2601. This means that "the timber thereon shall be sold, cut, and removed in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational [facilities]." *Id.* The O&C Act requires the Secretary, through BLM, to declare the "annual productive capacity" of O&C timberland, and then offer such timber for sale annually. *Id.* As this Court has held, "failing to sell or offer for sale the annual sustained yield capacit[y] that BLM has declared for a given year warrant[s] [judicial] relief under [the APA]." *Swanson Grp. Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22, 27 (D.D.C. 2019) (internal citations omitted).

Consistent with Supreme Court precedent, this Court has previously ruled that other resource management statutes and presidential directives do not override the O&C Act's sustained-yield mandate. In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the Supreme Court held that section 7(a)(2) of the ESA does not alter mandatory duties imposed on agencies by other statutes. *Id.* at 669. Following this precedent, this Court invalidated a series of RMPs issued by BLM pursuant to Federal Land Policy and Management Act of 1976 that limited timber productions O&C Lands in accordance with the ESA. *AFRC v. Hammond*, 422 F. Supp. 3d 184 (D.D.C. 2019). The Court explained that "[the] RMPs violate the O&C Act by setting aside timberland in reserves where the land is not managed for permanent forest production . . . ." *Id.* at 191. The Court also invalidated Presidential Proclamation 9564, explaining that the Proclamation similarly "conflict[ed] with the directives from Congress in the O&C Act." *Id.* at 193.

The Delay Rule violates the O&C Act for the same reason. Indeed, the 2021 Rule explains that the exclusion of 1,373,693 acres of O&C Lands is appropriate because "[t]he O&C Act provides, and the courts have confirmed, that the primary use of these revested timberlands is for permanent forest production on a sustained yield basis," and "the ESA does not take precedence over [this] mandatory (non-discretionary) statutory mission." 86 Fed. Reg. at 4,822. The Delay Rule reverses course, extending the 2012 Rule's designation of these O&C Lands as critical habitat. As a result, these O&C Lands are unavailable for sustained-yield timber harvest, as required by the O&C Act. By prohibiting BLM from complying with the sustained-yield mandate applicable to these lands, the Delay Rule violates the O&C Act, 43 U.S.C. § 2601, and is arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of the Service's statutory authority.

**D.      The Delay Rule must be vacated and the 2021 Rule's effective date reinstated.**

Given the violations addressed above, "the APA mandates that the [c]ourt 'shall' 'set aside' the challenged 'agency action.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 152 (D.D.C. 2019) (quoting 5 U.S.C. § 706). "When a court concludes that agency action is unlawful, 'the practice of the court is ordinarily to vacate the rule.'" *Nat'l Venture Cap. Ass'n v. Duke*, 291 F. Supp. 3d 5, 20 (D.D.C. 2017) (citation omitted). Indeed, the D.C. Circuit has made clear that "deficient notice is a 'fundamental flaw' that almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009)); *see also In re Long–Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 853 F. Supp. 2d 138, 144 (D.D.C. 2012).

No departure from this standard remedy is appropriate here because vacatur of the Delay Rule and reinstatement of the 2021 Rule would not lead to disruptive consequences. Rather, vacatur would allow the 2021 Critical Habitat Rule to go into effect as previously planned, leaving all parties in the same position "they would have been in if the APA had not been violated." *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d at 768.

## V.      CONCLUSION

Defendants' Delay Rule unlawfully amended the duly promulgated 2021 Rule, in violation of the APA and the O&C Act. Accordingly, Plaintiffs respectfully request this Court to grant summary judgment in their favor, vacate the Delay Rule, and declare that the 2021 Rule is in effect as of March 16, 2021.

Dated: March 23, 2021

Respectfully submitted,

By:     */s/ Tyler G. Welti*

Tyler Welti, D.C. Bar #1015691 (*Pro Hac Vice pending*)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
tgwelti@venable.com
415.653.3714
415.653.3755 (fax)


By:   */s/ Katherine K. Sochacki*

Katherine Sochacki, USDC-DC #1617415
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
kksochacki@Venable.com
202.344.4020
202.344.8300 (fax)

*Attorneys for Plaintiff American Forest Resource Council, Association of O&C Counties, and Siskiyou County*


Lawson E. Fite, USDC-DC #OR0009
AMERICAN FOREST RESOURCE COUNCIL
700 N.E. Multnomah St., Ste. 320
Portland, OR 97232
lfite@amforest.org
503.222.9505
503.222.3255 (fax)

*Attorney for Plaintiff American Forest Resource Council and Siskiyou County*


Dominic M. Carollo, USDC-DC #OR0011
630 SE Jackson Street, Suite 1
P.O. Box 2456
Roseburg, Oregon 97470
dcarollo@carollolegal.com
541.957.5900
541.957.5923 (fax)

*Special Counsel for Douglas County*

37

Susan Elizabeth Drummond (*Pro Hac Vice pending*)
DC Cir. Ct. App. #56482; WSBA #30689
LAW OFFICES OF SUSAN ELIZABETH DRUMMOND, PLLC
5400 Carillon Point, Bldg. 5000, Ste. 476
Kirkland, WA 98033
susan@susandrummond.com
206.682.0767
425.576.4040 (fax)

*Special Counsel for Lewis and Skamania Counties*